IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ChipBLASTER, INC., and        )
GREGORY S. ANTOUN,            )
              Plaintiffs      )
                              )
        v.                    )    CIVIL ACTION NO. 04-250 ERIE
                              )
MIKE KENNEY TOOL, INC.,       )
d/b/a COOLJET SYSTEMS,        )
              Defendant       )

<u>DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Thursday, June 30, 2005.

<u>APPEARANCES</u>:

STANLEY D. FERENCE, III, Esquire, appearing on
behalf of the Plaintiffs.

FREDERIC G. ANTOUN, Esquire, appearing on behalf
of the Plaintiffs.

LELAND P. SCHERMER, Esquire, appearing on behalf
of the Defendant.

CRAIG A. GELFOUND, Esquire, appearing on behalf
of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

1                          P R O C E E D I N G S

2

3          (Whereupon, the proceedings began at 10:05 a.m., on

4    Thursday, June 30, 2005, in Courtroom C.)

5

6          THE COURT:  This is the time we've set for oral

7    argument on the motion for partial summary judgment filed on

8    behalf of the defendant.  Who's going to be arguing on behalf

9    of the defendant this morning?

10          MR. GELFOUND:  I will, your Honor, Craig Gelfound.

11          THE COURT:  Do you want to come on up to the podium.

12    I've had an opportunity to read the briefs, I'm conversant with

13    the case law, I'm also conversant with the record.  Fire away.

14          MR. GELFOUND:  Thank you, your Honor.  I think this

15    is a very straightforward and simple case, there's been a lot

16    said in the briefs.  A lot of evidence has been introduced.  I

17    think some of that tends to obscure some of the issues, I'd

18    like to break through that obscurity today and concentrate on

19    what the real issues are.  And I think once we do so, summary

20    judgment may be in order.

21          CoolJet technology, just to give some background.

22    Very briefly, CoolJet produces a product, produces a coolant

23    delivery system for machine tool operations.  They have a pump,

24    the pump delivers fluid from a reservoir to a tool.  The pump

25    is driven by a motor.  The speed of the motor determines the

1    pressure at which the coolant is delivered to the tool.

2              THE COURT:  Can I interrupt you for a minute.

3              MR. GELFOUND:  Please.

4              THE COURT:  Let me see if I can start to clear out

5    some of the underbrush here, things that I may have thought

6    were in dispute but genuinely are not.  In preparation for our

7    get-together today, I went back and reread our status

8    conference where I had asked for an overview.  My first

9    question is this.  The term computer is used in the claim.  And

10   if I remember correctly, in your papers there was some attempt

11   to suggest that you don't really use a computer like a main

12   point.  Is it fair to say when I peel, try to peel the apple

13   backward to get to the core, I see this case coming down to one

14   primary dispute.  And that is whether or not you, your machine

15   adjusts the speed of the pump based upon both the pressure and

16   the size of the orifice.  And the corollary to that is whether

17   or not your computer, I put quotes around computer, is

18   programmed in advance with information relative to the size of

19   the orifice.  You say the critical difference between your

20   machine and their machine, such that your machine does not

21   literally infringe, is that you rely exclusively on the

22   pressure, quite independent of the orifice size.  Where the

23   clear language of their claim requires their machine to

24   consider both.  Now, do you view that as one of the central

25   issues of the case?

1   MR. GELFOUND:  Yes, I do.  I believe that is the

2   central issue that we present in our summary judgment motion

3   today.

4   THE COURT:  All right.  And before we talk a little

5   bit, I'm sure you'll talk a lot about why there is no material

6   issue of fact as to whether or not your patent infringes -- let

7   me see if I can find my note on this.  It's your view, I take

8   it, and I'm on the claim construction end of things now, I'm

9   not on the infringement end, we're just looking at the claim,

10  you don't see anything ambiguous about the language to the

11  claim, do you?

12  MR. GELFOUND:  I do not.

13  THE COURT:  All right.  Do I take it, then, that

14  seeing nothing ambiguous under <u>Victronics</u> and that line of

15  cases, it would be your view that all I need to do is

16  intrinsically look at the language of the claim, there's no

17  reason to go outside the claim and the real battle ground,

18  insofar as you are concerned, is whether or not your patent

19  infringes?

20  MR. GELFOUND:  I would say that, I would say that's

21  true.  I would qualify that to the extent there is an ambiguity

22  or some ambiguity is believed to exist, then we should look at

23  the specification to clarify that ambiguity.

24  THE COURT:  Is there an ambiguity in your view?

25  MR. GELFOUND:  In my view, no.

1        THE COURT:  All right.  Now, let me cut right to the

2  chase.  And the chase, as far as I'm concerned, is Mr. Adelman.

3  Mr. Adelman -- let me see if I brought it out with me, filed an

4  affidavit.  Well, it's the declaration of William Adelman.  I'm

5  paraphrasing it now, it speaks for itself, and you spent a

6  considerable amount of time addressing it in your papers, by

7  way of attempting to disabuse me of a perceived notion that

8  that might have created a material issue of fact.  Mr. Adelman

9  essentially says that -- the CoolJet system operates in such a

10  way that in part it is programmed with the area of the orifice.

11  He says that at several different paragraphs.  In your papers

12  you acknowledge the fact that in a summary judgment setting

13  experts can weigh in with opinions, which under certain

14  circumstances can be sufficient to create an issue of fact or

15  perhaps resolve an issue of fact.  But do I take it that your

16  major objection with Mr. Adelman, insofar as his ability to

17  create an issue of fact, is that you feel that his opinions are

18  unsubstantiated?

19        MR. GELFOUND:  That's right, your Honor.  I feel

20  that they're merely conclusory, they have no support.  Their

21  opposition -- it's said in a lot of different ways.  But what

22  they're saying, basically, is two propositions.  One, that the

23  CoolJet system can maintain a constant pressure only over a

24  fixed or a finite range of flow areas or the tool.  And,

25  second, that that range must be programmed into the system.

1    Now, with respect to the first proposition, I think I would

2    agree, I'll admit here in open court that the system can only

3    handle a finite range of orifices.  What happens in the system,

4    as I was discussing previously and I'm sure you're aware of, is

5    as the pressure of the orifice starts to grow, assuming

6    everything in the system remains constant --

7            THE COURT:  If the orifice grows, the pressure

8    drops?

9            MR. GELFOUND:  The pressure drops, the motor speeds

10    up.  At some point in time the motor is going get at its

11    maximum operating speed.  You can't make the motor go any

12    faster.  If the orifice size increases, the pressure drops

13    further, the feedback loop can't correct that.  The orifice --

14    it's a limitation on the motor, and no amount of programming

15    will change that.  No amount of programming can change the

16    speed of the motor.  If you need to support a larger orifice

17    size, you need a higher performance motor.  So you select your

18    motor, you select your pump to meet ultimately what you expect

19    to use on the machine.  But there's absolutely no reason to

20    program that information into the system.

21            THE COURT:  When you say that information, do you

22    mean orifice, the range of --

23            MR. GELFOUND:  The range of the orifice size.

24            THE COURT:  So I'm clear, I think I'm clear, the

25    reason you say there is no information, that there is no reason

7

1    to do that is because you contend in your feedback system you

2    get all the material information you need based upon pressure

3    alone?

4              MR. GELFOUND:  That is correct.  And if I might add,

5    just to go back to the claim construction.  Even if, even if

6    the range was programmed into the system, which we conclude

7    it's not --

8              THE COURT:  Do you mean the range of potential

9    orifice sizes?

10             MR. GELFOUND:  That's correct, the range of

11   potential orifice size.  It still wouldn't satisfy the

12   limitations of the claim.  Because remember the claim requires

13   that the speed of the motor be determined by, one, coolant

14   pressure and, two, the flow area of the orifice.  Let me just

15   give you an example.  If the pressure was balanced with psi,

16   and the tool orifice size was two millimeters, two square

17   millimeters, and you programmed into the machine the range of

18   orifice size that can be handled.  For example, say one to four

19   millimeters, in which the machine can maintain a constant

20   pressure.  From that one to four millimeters, you still would

21   not have any information on the size of the orifice.  You would

22   still not know whether it's a one, two, three or four

23   millimeter orifice size.  Yet, you need that information in

24   combination with pressure to compute the speed of the motor,

25   that's a requirement of the claim.

1         THE COURT:  All right.  Go ahead.  Tell me whatever

2 else you want to tell me?

3         MR. GELFOUND:  Well, let's go back to the claim

4 interpretations, I think that's the central issue here.  I

5 think if a claim interpretation is construed properly, then we

6 don't even have to consider ChipBLASTER'S brief.  We just

7 talked a moment ago about the specific claim language, how the

8 speed of the motor is determined.  But there's at least two --

9 well, there's actually three reasons why the claim

10 interpretation I'm proposing is the right interpretation.  One,

11 it's consistent with the claim language.  It's consistent with

12 other terms in the claim, it's consistent with --

13         THE COURT:  Not to interrupt you, why, if the

14 language is clear, is it necessary to interpret anything, what

15 are we interpreting -- what are the terms of art that are

16 ambiguous, what are the technical terms -- what are the terms

17 that may have acquired meaning?

18         MR. GELFOUND:  I don't think the terms do require

19 special meaning.  Let me state what I think the issue is here.

20 We contend, again, to compute, to determine the speed of the

21 motor, you must use both the pressure and the flow area of the

22 orifice.

23         THE COURT:  Under their claim?

24         MR. GELFOUND:  Under the claim.  The other side

25 urges a different interpretation.  That all that is required is

1    that you determine the speed based on the pressure.  According

2    to the other side, I believe, since orifice size may affect

3    pressure, that that information is not really required.

4            THE COURT:  I'm speculating here and it's neither

5    here nor there, but does it strike you as a possibility that

6    perhaps that claim language was unartfully drafted?

7            MR. GELFOUND:  I don't think that's true.  Because,

8    again, to the extent it's ambiguous, because it was not

9    artfully drafted, then we can turn to the spec to see what

10   those claims really mean.  What the inventor had intended.  And

11   I think there are sufficient examples in the specification that

12   show that the speed -- the computer receives both.  The

13   pressure and the flow, the flow area of the orifice size to

14   ultimately compute the speed.  Can I go over one?

15           THE COURT:  Sure.

16           MR. GELFOUND:  In my reply brief and I think in my

17   moving papers, I referred to one section in the spec.  And I'm

18   sure you read it.  So I'm not going to repeat that one.  But

19   flying here yesterday I came across, reading the spec again,

20   another section that I thought was very interesting, and that's

21   not in my brief, I thought it might be worth talking about it

22   this morning.  And it really answers the question why.  Why

23   would a feedback system want to know what the orifice size is,

24   isn't it enough to just have pressure, can you change the speed

25   of the pump based on pressure, using feedback to maintain it at

1    a constant pressure.  What purpose does the orifice size serve.

2    And there's an interesting passage in the specification, I

3    think deals directly with that.  I don't know if you have it in

4    front of you, it's column two, lines 35 to 42.  Let me just

5    read it, it's rather short.  "While the coolant supply system

6    is self-correcting, that is the speed of the motor can be

7    adjusted for pressure variations, by providing the computer

8    with each tool's coolant pressure requirements," and by the way

9    coolant pressure requirements are defined in the preceding

10   sentence as the flow area orifice.  So let me read that again.

11   "By providing the computer with each tool's coolant pressure

12   requirements, the computer can anticipate pressure fluctuations

13   and react by adjusting the pump motor speed prior to the

14   fluctuations occurring."  Now, what that means is that if you

15   have a two millimeter tool, and you swap out to a three

16   millimeter tool, instead of waiting for the pressure to drop

17   and the feedback loop to kick in to actually adjust the speed

18   of the motor, to maintain the pressure, if you know in advance

19   that you're going to change the tool from a two to a three

20   millimeter tool, you can send that information to the computer,

21   the computer then can compute the speed ahead of time based on

22   the desired pressure and that three millimeter tool orifice

23   size.

24            THE COURT:  So, in other words, you're saying that

25   that prevents the slight delay that you might have, is that

1    what you're saying?

2           MR. GELFOUND:  That's right.  It's quicker.  That is

3    simply one use of using data or information that actually tells

4    the computer what the flow area size is.  Which I think is

5    undisputed that we don't have a signal that in fact contains

6    that information.

7           THE COURT:  I'm not sure that is undisputed, but

8    we'll see.  How do I, in trying to resolve this, of course, it

9    would inappropriate for me to resolve it if I find an issue of

10   material fact.  You fundamentally and your experts

11   fundamentally disagree with Mr. Adelman's conclusion that your

12   system also requires the programming of orifice size as one of

13   the conditions of maintaining a variable flow; you

14   fundamentally disagree with Mr. Adelman's conclusion in that

15   regard, don't you?

16          MR. GELFOUND:  That is correct, your Honor.

17          THE COURT:  I'm not trying to be overly simplistic

18   here, but I don't like getting reversed at the circuit anymore

19   than anybody else, why isn't that the beginning and end right

20   there, why don't I have a material issue of fact on my plate,

21   if for no other reason because of Mr. Adelman?

22          MR. GELFOUND:  I think there's a number of reasons,

23   in my opinion.  I mean, let's start with the fact that it is

24   expert opinion and it appears to be expert, there is no

25   personal knowledge --

1    THE COURT:  He's the chief engineer at ChipBLASTER,

2  he's an expert.

3    MR. GELFOUND:  He's an expert.  It's an opinion.

4  But he's provided no basis, no facts, no rationale, no

5  reasoning, why this information needs to be programmed into the

6  system.  As I talked about earlier, there is going to be a

7  range of orifice that can be supported by constant pressure.

8  That is going to be based on the capability of the motor and

9  the capability of the pump.  No amount of programming can

10  change that.  So, it appears to me that they don't meet the

11  requirement of 56(e).  Let me raise two other points with

12  respect to Mr. Adelman's testimony.  Now, I want to refer back

13  to the specification, I think this is a good opportunity to do

14  so since this is not in our moving papers.

15    THE COURT:  All right.

16    MR. GELFOUND:  Again, I don't know if you have it in

17  front of you, I'll read it, this is column four actually.

18    THE COURT:  Where does it appear in the record?

19    MR. GELFOUND:  It appears in the record as a request

20  for judicial notice filed by plaintiffs in the patent.

21    THE COURT:  I'm sorry?

22    MR. GELFOUND:  It's in the patent -- which is

23  submitted pursuant to a request for judicial notice.  This is

24  out of the spec.  And, interestingly, it says "the inherit

25  characteristics of the fluid control unit are programmed into

1    the computer.  The only critical relationship that the computer

2    needs to be programmed with," again, I'll repeat that, "the

3    only critical relationship that the computer needs to be

4    programmed with is the frequency required to drive the pump at

5    a speed that results in the desired coolant pressure."  It says

6    nothing in here about the range of orifice size.  Now, if you

7    go to the declaration, what Mr. Adelman says is that the range

8    of orifice size must, he uses the word must, be programmed into

9    the system in order for the system to operate properly.

10              THE COURT:  That's pretty much what he says.

11              MR. GELFOUND:  And there is no mention about that in

12    the spec, the spec goes out of its way to identify the only

13    critical element that's required.  So I think that the patent

14    application is far more probative than the declaration.  Let me

15    raise one more point that I think is very critical.  Let's

16    assume, and we don't agree, but let's assume for sake of

17    argument that the range is programmed in the computer.  Let's

18    assume the range that can be supported is one to four

19    millimeters.  And according to Mr. Adelman, if we go into the

20    computer and we program one to four millimeters, now --

21              THE COURT:  Those are the range of the drill tools

22    which might be used?

23              MR. GELFOUND:  That's right, in which the system can

24    maintain a constant pressure.

25              THE COURT:  All right.

1    MR. GELFOUND:  Let's assume the pressure system is

2    1,000 psi.  Let's assume that the tool orifices at the tool

3    that actually is being used has an orifice of two millimeters.

4    Now, the computer needs to determine the speed of the motor

5    based on both the pressure and the orifice size.  The flow area

6    of the orifice size.

7        THE COURT:  Hold your thought for one second, will

8    you.  I'm sorry, go ahead.  Start that all over again, will

9    you?

10       MR. GELFOUND:  The scenario I'm laying out, we have

11   a system that can support tools within an orifice range of one

12   to four millimeters, which would be programmed into the

13   computer.  We have a thousand psi in our system.  We have a

14   tool with an orifice size that's actually being used of two

15   millimeters.  The computer receives a signal from the

16   transducer saying it has a thousand psi.  And it knows, because

17   it's programmed with this information, that the range is one to

18   four.  But it still has no way to determine from that

19   information program that says the orifice range is one to four,

20   it has no way to determine what the actual orifice size is.  It

21   doesn't know whether it's one, two, three or four.  It needs to

22   have that information, it needs to compute the speed of the

23   motor based on a thousand psi and two millimeters.  And it

24   can't obtain it from range of information.  Even if the range

25   of information is programmed into the computer, it doesn't

1    matter, the product is still not covered by the claim.

2                THE COURT:  Let me ask you this question.  I'm going

3    to ask you to talk to me about their product and how you

4    understand their product actually works.  Now, I know what

5    their claim says and I know what you say their claim says,

6    which is the speed of the pump is a product of two components;

7    a pressure reading and an orifice reading.  Now, if you can't

8    do it, and if it makes no sense for you to do it, your point

9    being pressure is pressure, if you test the pressure that's all

10   you need to know, because the pressure is nothing more than a

11   byproduct of orifice size.  If you can't do it, how can they do

12   it -- does it make any more sense for them to do it than for

13   you to try to do it?

14               MR. GELFOUND:  Well, I just gave you an example in

15   the specification of one benefit of using the dimension of the

16   tool, and that was to increase the response time.

17               THE COURT:  But you don't do that, do you?

18               MR. GELFOUND:  We don't do that.  We use the

19   fundamental feedback loop that has been used for years.  That

20   has been used by Grundfos --

21               THE COURT:  Do they do that?

22               MR. GELFOUND:  I can't answer that, your Honor,

23   because I don't know --

24               THE COURT:  You don't think they know what they're

25   doing.  In your papers, it's not a pejorative, but I think you

1    indicate part of the problem is you are not convinced that the

2    plaintiff understands its own product or your product?

3                MR. GELFOUND:  I'm not sure that was the point I was

4    trying to make, your Honor.  I think that I took objection to

5    the fact that they were trying to compare their product with

6    our product, which I think is trying to taint us before the

7    court and it's immaterial to patent infringement.  If their

8    design fits within the scope of their patent, fine.  If they

9    redesigned it for any other reason, fine.  All this comparison

10   stuff merely says that they decided, if in fact their machine

11   operates like ours, they decided to not use the technology

12   embodied in their patent, rather than go to a more commercially

13   viable approach.

14               THE COURT:  This is purely a hypothetical.  If it

15   were determined that as a matter of fact, engineering fact, I

16   guess, that your product, in order to perform its desired

17   function, required the programming of orifice size in a similar

18   fashion to what the plaintiffs' product does, would you concede

19   that there would be a potential problem with respect to literal

20   infringement?

21               MR. GELFOUND:  I'm not sure I fully appreciate your

22   question, your Honor.

23               THE COURT:  I can rephrase it, then I'll let you

24   talk, I apologize for interrupting you.

25               MR. GELFOUND:  No problem.

1           THE COURT:  If your premise is that you are entitled
2   to summary judgment because as a matter of fact your product is
3   materially different in that it does not require the
4   programming of orifice size, my question is, if it would come
5   to pass that a fact finder were to conclude that it does
6   require the programming of orifice size, would there be an
7   infringement problem?
8           MR. GELFOUND:  I can't -- answer that one-hundred
9   percent, but I will concede this.  That in the context of a
10  summary judgment, as presented to you here today, with regard
11  to the issues I raise, I would say if it is shown, yes.  If it
12  were shown that the computer must be programmed with the actual
13  orifice size that's being used in the machine, which means that
14  it's dynamic, it's changing, so if you switch from two to
15  three, now we receive a signal from the tool or elsewhere --
16          THE COURT:  Such that the computer or the mind of
17  the machine is actually sensitive to the switch of orifices?
18          MR. GELFOUND:  Yes.  And I must also add that it
19  must also, not just be programmed with that information, but it
20  must then use that information in combination with the pressure
21  to arrive at the speed of the motor.
22          THE COURT:  Could it be that one of the reasons that
23  you might want a system which produced a motor speed based on a
24  combination of pressure and orifice readings, is that it
25  prevents any delay in the system when an orifice is changed?

1          MR. GELFOUND:  Well, yes, your Honor, I just read a

2    passage of the specification that addressed that.

3          THE COURT:  All right.  Of course, in addition to

4    literal infringement there is the doctrine of equivalents.  And

5    you spend sometime in your brief talking about the

6    inapplicability of that doctrine based I think in large measure

7    on your contentions relative to prior art, is that right?

8          MR. GELFOUND:  That is correct, your Honor.

9          THE COURT:  Tell me a little bit about that?

10         MR. GELFOUND:  We contend and we've submitted

11   declarations to evidence that our system is very much like the

12   Grundfos system that existed prior to the Antoun patent.  When

13   I say very much like the Grundgos system, I mean very much in

14   the context of the claim --

15         THE COURT:  That was a closed-loop feedback system

16   based on pressure?

17         MR. GELFOUND:  That's right.  They have a pump, the

18   motor, the speed of the motor is controlled by the feedback

19   loop.

20         THE COURT:  That was 1995 or something?

21         MR. GELFOUND:  That is correct.

22         THE COURT:  So did you knock off their system?

23         MR. GELFOUND:  No, we did not.  But we looked at

24   their system.  By the way, they didn't patent their system, so

25   it is in the public domain.  Had they had a patent, we would

1    have never had knocked off anything, I assure you, your Honor.

2            THE COURT:  I take you at your word.  In any event,

3    your point is it was out there in the public domain?

4            MR. GELFOUND:  It was out there in the public domain

5    exactly what we were doing.  Now, ChipBLASTER contends that the

6    pumps are different.  And I might be getting this mixed up,

7    either we or, I'm sorry, either the patent or the Grundfos

8    system, I think it's the Grundfos system, required an impeller

9    pump.  Which is different than the pump that ChipBLASTER uses

10   and discloses in its specification.  But the claims are not

11   limited to that type of pump.

12           THE COURT:  What was the name of your initial

13   product, I can't remember it?

14           MR. GELFOUND:  The prototype?

15           THE COURT:  The one you had to punch in and it

16   didn't sell very well?

17           MR. GELFOUND:  That was the AutoSep, your Honor.

18           THE COURT:  And that was a product that actually the

19   mind or the controller, if you will, of that was the operator,

20   right?

21           MR. GELFOUND:  I don't agree, that is a

22   characterization that was made by ChipBLASTER.  The dial on the

23   front was used to set the pressure, as opposed to punching it

24   in or programming it in.  But once you set the pressure on the

25   dial, whether it's 900, 1,000, 1,100 psi, the feedback loop

1   would still control.  In other words, the transducer would

2   monitor the pressure in the system and provide feedback to

3   control the motor speed to maintain a constant pressure.

4           THE COURT:  All right.  Just by way of background,

5   it is not germane, but it's more informational, you two folks

6   aren't the only outfits who make these variable pressure

7   machines, are you or are you?

8           MR. GELFOUND:  To the best of my knowledge, no.

9   I think there may be others, I can't say for certain.

10          THE COURT:  All right, I see plaintiffs' counsel

11  shaking his head, we'll hear from him presently.  Is there

12  anything else you want to tell me before I hear from them, then

13  I'll let you reply when they're done?

14          MR. GELFOUND:  Yes, I think we touched upon just

15  about everything.  I will say that I did submit, as you recall

16  in my reply brief, this lengthy manual.  A number of chapters

17  out of the Toshiba instruction manual.  And I apologize, your

18  Honor, I thought long and hard before doing this.  There is a

19  lot of information, I hate to clutter your desk, but I thought

20  it was important.  Because all the programming that occurs is

21  in the VFD, the variable frequency drive.  And this manual

22  talks about every single parameter and describes the function

23  of every single parameter.  So if you looked at this and read

24  through this, you would find that not a single parameter has

25  anything to do with the orifice size, the flow area of the

1    orifice.  It deals with increasing or optimizing the response

2    time of the motor.  I think that this alone is proof positive

3    that there is no programming of information with regard to the

4    range of orifice sizes used in the system.  But I would further

5    say that even if the range is programmed, there's still no

6    infringement because there's no way to determine what the

7    actual orifice size of the tool is, which is required in

8    combination with the pressure to determine the speed of the

9    motor.

10                   THE COURT:  All right, thank you, Mr. Gelfound.

11                   MR. GELFOUND:  Thank you, your Honor.

12                   THE COURT:  Who is going to be arguing for the

13   plaintiffs?

14                   MR. FERENCE:  Your Honor, Stanley Ference for the

15   plaintiffs.

16                   THE COURT:  All right.

17                   MR. FERENCE:  Your Honor, this is a summary judgment

18   motion for non-infringement brought by CoolJet.  As such, they

19   have the burden of proof here.  Mr. Gelfound makes the argument

20   in his papers that somehow ChipBLASTER has failed to prove

21   infringement.  That's not our burden.  Our burden -- what Mr.

22   Gelfound's burden is, is to show that there is no disputed

23   issue of material fact.  We submit that, we have submitted

24   evidence that shows there is a disputed issue of material fact.

25                   THE COURT:  What do you believe to be the critical

1    disputed issue of material fact or facts in this case, then

2    we'll work backward from there?

3              MR. FERENCE:  Your Honor, as it's teed up in the

4    papers and as you brought to Mr. Gelfound's attention, it's

5    whether or not the CoolJet equipment is programmed with data

6    related to the flow area of the orifice means.  Mr. Gelfound is

7    talking about the flow area itself.  The claim language,

8    however, requires data related to the flow area of the orifice

9    means.

10             THE COURT:  All right.  Now, this will be helpful

11   for me before we begin our discussion.  Give me, by way of a

12   quick refresher course, a brief description as to precisely how

13   your machine works?

14             MR. FERENCE:  What our machine does is it maintains

15   a constant volume of coolant through a cutting tool, and a

16   cutting tool as the flow area.  It's a drill bit with a

17   cylinder down the center, the coolant is pumped through.

18             THE COURT:  It's not unusual, is it, that during the

19   course of a working day that the drill bit or tool end will be

20   changed many times?

21             MR. FERENCE:  That's correct.  This is all

22   automated.  The machine in the shop is typically a

23   self-contained unit, it's run by a computer, and there's no

24   human intervention.

25             THE COURT:  All right.

1      MR. FERENCE:  When the tool is changed, you want to

2  maintain a constant volume.  The volume is programmed at some

3  point into the machine, and you go from there.  When the tool

4  bit is changed, there is a pressure change.  There's a

5  transducer that controls the speed of the motor.  Now, the

6  motor itself, the drive is programmed prior to operation.  As

7  pointed out, the dispute here is essentially how the machines

8  operate.  If we look at what is in the record for the evidence

9  to this, the only evidence that CoolJet has submitted with

10  respect to the operation of its machines is contained in the

11  declaration of Mike Kenney.  In particular, two paragraphs.

12  Paragraph six says, "CoolJet's variable speed pumping system

13  does not have a computer between the transducer and the

14  variable frequency drive.  Instead, the pressure signal from

15  the transducer is fed directly to the variable frequency

16  drive."  Paragraph seven says, "CoolJet's variable speed

17  pumping system does not program a computer with any data

18  related to the flow area of the orifice.  Nor does it use this

19  information to determine the speed of the pump motor.  In the

20  CoolJet's variable speed pumping system, the speed of the pump

21  motor is determined solely by the coolant pressure."  That is

22  the only evidence before the court that CoolJet has submitted

23  on the operation of its equipment.

24      THE COURT:  That's what he says.  What does Mr.

25  Adelman say on the point?

1          MR. FERENCE:  Well, we submitted three declarations.

2    Mr. Adelman talks about the operation of the CoolJet equipment,

3    so does Mr. Antoun's declaration.  Mr. Antoun talks about the

4    operation based on some of the publicly available information.

5    He talks about how the CoolJet equipment is programmed with

6    data related to the flow area, the area of the orifice.  Mr.

7    Adelman talks about that.  And Mr. Adelman goes a step further

8    and uses information that is available on CoolJet's Web site to

9    actually calculate the range of the flow area that the CoolJet

10   equipment is programmed to operate at.  Then we also submitted

11   Mr. Hapeman's declaration.  Mr. Hapeman is a technical expert

12   that actually reviewed the CoolJet equipment.  And goes into

13   some detail as to how they go about programming it.  So we have

14   Mr. Antoun talking about how generally this type of equipment

15   needs to be programmed with data relating to the area of the

16   flow orifice.  We have Mr. Adelman who actually goes through

17   and calculates the range of the flow area that the CoolJet

18   equipment is programmed to operate in.  And then we have Mr.

19   Hapeman who talks about exactly how CoolJet is programming

20   their drive.

21          THE COURT:  Let me ask you this.  Would it be

22   accurate to say on a given day with respect to a given machine,

23   you would know in advance or the programmer would know in

24   advance that -- the pressure will be running between 100 psi

25   and 1,000 psi, depending upon the nature of the job, fair

1   enough -- there's a range within which it will vary during the

2   course of a workday.  Now --

3            MR. FERENCE:  Correct.  And in the deposition

4   testimony of CoolJet, it was discovered that the CoolJet

5   equipment will not operate until it is programmed.  And then

6   once it is programmed, it is tested to insure that it does

7   operate over the intended range.

8            THE COURT:  Now, I might be oversimplifying this,

9   but I gather that what CoolJet is saying is this.  That they

10  have a system which is sensitive to picking up and is

11  programmed to pick up variations in pressure.  And when the

12  system picks up a variation in pressure, then it either speeds

13  up or it slows down the pump?

14           MR. FERENCE:  Yes.

15           THE COURT:  And I might be oversimplifying this, but

16  their point is why for heaven sakes do we have to worry about

17  the size of the orifice if the amount of pressure that is

18  ultimately being produced at any given point in time is simply

19  a function of the size of the orifice.  So if we're skinning

20  the cat on the pressure end, why do we have to skin the cat

21  twice and also crank in what the orifice is; do you follow my

22  point?

23           MR. FERENCE:  Well, there's several reasons, your

24  Honor.  One of which is the equipment is expensive and you want

25  to maintain the life of the equipment.  You don't want to burn

1    the motor up.

2            THE COURT:  All right.

3            MR. FERENCE:  So there has to be some programming,

4    because if the orifice size just increases and increases and

5    increases in order to try and maintain that pressure, the motor

6    is going to go, go and go until it burns out.  So there has to

7    be some programming as to the low and high operating speeds of

8    the motor, which is based on the orifice, most other things is

9    based on the orifice size.  And the pressure itself is also

10   based on the orifice size.  The only thing that changed in the

11   operation of one of these machines is the size of the orifice.

12           THE COURT:  So the pressure can't be based on

13   anything other than the orifice size, can it?

14           MR. FERENCE:  That's correct?

15           THE COURT:  Okay.  So, if you have a system that is

16   sensitive to changes in pressure, you really have a system

17   which is at least indirectly sensitive to changes in orifice

18   size, right?

19           MR. FERENCE:  Correct.  I mean, there are some

20   statements in the reply brief from CoolJet along those lines,

21   that seem to -- our questionable.  One of which appears on page

22   five.  "Even if the orifice diameter range was programmed into

23   the variable frequency drive, the accused products would still

24   not infringe because that data provides no information

25   whatsoever about the flow area of the tool orifice."  Area is a

1  mathematical formula based on the radius, which is one-half of

2  the diameter.

3  　　　　THE COURT:  Here's the heart of it.  Does your

4  system, in order for it to function the way it's designed, is

5  it necessary that in advance of a run, if you will, you program

6  information via your computer as to -- actually, I should say

7  you program your computer with information related to the area

8  of flow of the orifice like your claim says?

9  　　　　MR. FERENCE:  Both systems do, your Honor.

10  　　　　THE COURT:  All right.  But yours -- I want to get

11  this clear.  The type of information that you would input into

12  your computer, related to the area, related with data related

13  to the flow area of the orifice, what type of information would

14  that be, tell me again -- what does the computer want to know

15  and what do you want to put in it relative to the flow area of

16  the orifice?

17  　　　　MR. FERENCE:  What you're doing is you're

18  programming the computer, the computer's control algorithm, and

19  this is all set forth in Mr. Hapeman's declaration.  It's a

20  proportional-integral-derivative controller.  And various

21  parameters for the drive are programmed in.  As we set forth in

22  our papers, CoolJet modifies the factory default parameters.

23  When they were asked what those parameters represented or how

24  the parameters that they programmed in were obtained, they

25  didn't know.  Okay, Mr. Whitaker didn't know what those

1    parameters represented, he didn't know how they were obtained.

2    Mr. Kenney also didn't know.  The people at CoolJet don't know

3    or were not able to tell us what those parameters represented

4    or how those parameters were derived.

5              THE COURT:  When your system is programmed with data

6    relative to the flow area of the orifices, does that mean that

7    it has (a), a memory, if you will, of the range of potential

8    orifices that may be used on a given day?

9              MR. FERENCE:  Yes.

10             THE COURT:  Number one.  But, number two, and

11   critically, does it not only have a memory as to the range of

12   potential orifices, but does it have a memory such that it can

13   instantaneously react and perceive when a new orifice is put on

14   and then make an adjustment?

15             MR. FERENCE:  If I understand the question

16   correctly, what happens is when the new orifice is put on,

17   there's an adjustment made to the speed of the motor such that

18   the pressure is maintained.

19             THE COURT:  All right.

20             MR. FERENCE:  The goal here is to maintain a

21   constant volume.

22             THE COURT:  All right.  But there also is a

23   component of your system that is constantly monitoring the

24   pressure itself, is that right?

25             MR. FERENCE:  Yes.  As there is in both systems.

1          THE COURT:  So, would this be fair to say, maybe I

2    said it before, if I have, forgive the repetition.  The reason

3    you designed a system that is both orifice sensitive and

4    pressure sensitive is that with respect to the orifice

5    sensitive aspect of it, it permits an instantaneous reaction to

6    a change in orifice size, such that you never lose any

7    pressure, is that right, essentially?

8          MR. FERENCE:  I think your question is based on --

9          THE COURT:  My question is just my question, do you

10   agree with it?  If you don't I'll have it read back, I don't

11   think I could ask it again, I asked it the way I wanted to.

12         MR. FERENCE:  Why don't we have the court reporter

13   read it back.

14         THE COURT:  All right.

15         (Court Reporter reads back Court's question.)

16         MR. FERENCE:  Your Honor, it's the transducer, the

17   pressure sensor that automatically kicks in and makes sure that

18   a constant volume is maintained.

19         THE COURT:  All right.

20         MR. FERENCE:  Now, as I started to say, Mr. Gelfound

21   was reading from the spec and, quite frankly, in my view what

22   he's trying to do is import limitations from the spec into the

23   claims.  The spec talks about the preferred embodiments at the

24   time the application was filed.  They're not to be used to

25   limit the scope of the claims.  The claims talk -- state what

1    the claims state about, and the limitations of the claims are

2    met by both systems.  Both by the ChipBLASTER system and also

3    by the CoolJet system.  Now, at the end of Mr. Gelfound's

4    argument you were asking about are there other people out there

5    manufacturing these systems.  The answer to that is no.

6    ChipBLASTER, whenever ChipBLASTER is aware of somebody else

7    manufacturing its system, they write to them, bring the patent

8    to their attention, and everybody but CoolJet has stopped

9    manufacturing the system.  So at this point in time CoolJet and

10   ChipBLASTER are the only two parties that we're aware of

11   manufacturing this patented system.

12              THE COURT:  All right.  Now, I think I understand

13   how you program your computer with information relative to the

14   orifices based upon our discussion.  Now, it's your contention,

15   notwithstanding the defendant's position to the contrary, that

16   as a matter of fact, as a matter of engineering fact, if you

17   will, the defendant does the same thing, correct?

18              MR. FERENCE:  Correct.

19              THE COURT:  It is your contention that in all

20   material respects the programming that you do, insofar as it

21   relates to orifice size, per your claim language, is precisely

22   the same programming that they do relative to orifice size?

23              MR. FERENCE:  Yes.

24              THE COURT:  Okay.

25              MR. FERENCE:  The equipment is the same footprint.

1   At one point the equipment was the same color scheme.  It

2   operates in substantially the same way, as set forth in Mr.

3   Adelman's declaration.  The components are virtually identical.

4               THE COURT:  Could you have a system, could you have

5   a system, a variable flow system, which would work perfectly

6   well which was only sensitive -- whose computer never knew a

7   thing about the potential range of orifices that might be used

8   during a given workday and all that the feedback system was

9   designed to be was sensitive at any given time to whatever the

10  pressure in the line happened to be; could you have a system

11  that could appropriately adjust the flow that was completely

12  ignorant, from a computer brain standpoint, as to what the

13  actual orifice size was at any given time?

14              MR. FERENCE:  It's my understanding that you could

15  not.  As was said in the depositions, the CoolJet equipment

16  will not operate without programming.  And it's my

17  understanding that there has to be programming data related to

18  orifice size in order for this equipment to operate.

19              THE COURT:  Are you splitting a fine hair when you

20  say the data program related to orifice size, are you using

21  that in the same sense as data programmed relative to range of

22  pressure to the extent that pressure is a function of orifice

23  size -- or are you talking about actual orifice size, actually

24  you program orifice size, don't you?

25              MR. FERENCE:  In the commercial embodiment we

1  program data related to orifice size just as CoolJet does.  As

2  I said, the patent was filed in '97, and the spec reflects at

3  that point in time what was the preferred embodiment.  Both

4  machines operate the same way.  And both machines use a

5  variable frequency drive.  Which in order to operate, has to be

6  programmed with data related to the orifice size in order to

7  operate.  Once the initial programming is completed and then

8  the system operates, you have a transducer which provides a

9  feedback control that gives -- also provides information

10  related to the orifice size.

11           THE COURT:  Knowing as much as you do about their

12  product, perhaps, in part by virtue of this litigation, are

13  there any improvements -- let me put it this way.  Does your

14  product partake of any qualities that in your view make it more

15  efficient than theirs or, otherwise stated, is their product

16  lacking in any qualities that make it more deficient than

17  yours?

18           MR. FERENCE:  Their product is a functional

19  duplicate of our product.  One of the things that came out at

20  the deposition -- when you talk about the AutoSep device,

21  that's what CoolJet was showing in 1998 at the ITMS show.  It

22  came back and a development effort on the current product was

23  led by the sales manager, who was at the ITMS show.

24  Essentially, the sales manager said I need one of these pieces

25  of equipment.

1　　　　　THE COURT:  If, as a matter of fact -- as a matter

2　of fact, this is the flip side of the same question I asked Mr.

3　Gelfound, if as a matter of fact the CoolJet system functions

4　completely independent of having programmed any information

5　relative to orifice size, it becomes problematic for your

6　position, doesn't it?

7　　　　　MR. FERENCE:  It does.  However, we believe that the

8　CoolJet equipment does not operate in that manner.

9　　　　　THE COURT:  In answering the question that way, you

10　would you agree with me, as I think Mr. Gelfound does, that

11　that issue, in the universe of potential material issues, is

12　perhaps the most material?

13　　　　　MR. FERENCE:  Yes, your Honor.  And I come back to

14　the evidence that is before the court, you need to make that

15　determination based on an understanding of the operation of the

16　CoolJet equipment.  The only evidence that CoolJet has

17　submitted on the operation of its equipment are the two

18　paragraphs in the declaration of Mike Kenney.  We've submitted

19　declarations of Greg Antoun, saying that the CoolJet equipment

20　is programmed, that all the equipment to operate in this manner

21　has been programmed.  We submitted the declaration of Bill

22　Adelman saying the same thing and going further, calculating

23　the range of orifice sizes for which the CoolJet equipment is

24　programmed to operate.  And we submitted the declaration of

25　Bryan Hapeman, who reviewed the CoolJet equipment and comes to

1   the same conclusion.  If we look at the Hapeman declaration,

2   the Hapeman declaration says, in paragraph eight, "both systems

3   regulate coolant volume with changes in the flow area of the

4   orifices with the control systems' desire to maintain a

5   particular pressure.  The systems are also physically

6   restricted from too high a pressure and by a mechanical relief

7   value and from delivering too high a coolant volume by drive

8   programming that restricts pump speed for those large area

9   orifices that do not offer enough of a pressure restriction."

10  And Mr. Hapeman's declaration --

11          THE COURT:  As I read that, that doesn't say

12  anything about programming -- he's not, whatever Mr. Adelman

13  may say, unless I'm reading it wrong, that's just another way

14  of saying that pressure is a function of orifice size.  Does he

15  say anything in that paragraph which supports the proposition

16  that as a preliminary matter the defendant programs information

17  relative to orifice size?

18          MR. FERENCE:  The last sentence of paragraph eight

19  talks about restricting the pressure based on drive

20  programming.  And what he's talking about there is setting an

21  upper limit on the pressure by programming the drive.

22          THE COURT:  I think the defendant would concede that

23  they do that -- I think they would concede that they program a

24  range of pressures -- is that right, you concede that?

25          MR. GELFOUND:  We concede that we program the

1    variable frequency drive to increase the response time of the

2    motor for optimized motor performance.

3           THE COURT:  I'm not sure that's in dispute.  I think

4    what's in dispute is whether or not they program orifice size.

5    See, what both bothers me, I have no fixed opinion on this, but

6    this is why this argument is helpful.  I want to make sure that

7    you aren't trying -- you know the phrase too cute by half.

8    You're not saying, it's not your position that they program

9    orifice size simply because they program to be sensitive to

10   pressure, and pressure is a function of orifice size, that's

11   not your point, is it, because if it is, I need to know it?

12          MR. FERENCE:  They don't do that when they initially

13   program the drive.  The drive is programmed initially to get

14   the drive to function.  And then during the operation of the

15   drive, it is also programmed through the feedback loop.

16          THE COURT:  Those are two different things.  But to

17   be clear, it's your position, although, you'd have to agree

18   with that, that pressure is a function of orifice size?

19          MR. FERENCE:  Very much so.

20          THE COURT:  If that's all they did, we wouldn't be

21   here, is that right -- do you understand my point; in other

22   words, they concede that their feedback system is pressure

23   sensitive.  But they say their feedback system is, that's the

24   reason their product works and the reason that it is capable of

25   maintaining a variable flow is based on pressure sensitivity

1   only.  Now, clearly, pressure is a derivative of orifice size?

2           MR. FERENCE:  I don't think they agreed that

3   pressure is a derivative of orifice size, though.

4           THE COURT:  Do you disagree with that?

5           MR. GELFOUND:  I would agree that -- I would agree

6   that pressure is a function of orifice size.  But I would like

7   to add that pressure can change based on a number of other

8   things.

9           THE COURT:  Well, I know it can.

10          MR. GELFOUND:  Then yes.

11          THE COURT:  I mean as a matter of physics, primarily

12  that is what changes the pressure, the orifice size.  You can

13  have a leak in the pipe, you can have something else, but the

14  primary moving force for variable pressure --

15          MR. GELFOUND:  I would also say that you need to

16  consider the tool length, and length of the tool chain, that

17  could have an impact.  The tool holder, the plumbing, the

18  viscosity.  I would absolutely agree that the orifice size does

19  influence pressure, of course.

20          THE COURT:  All right.  I'll take that as a yes for

21  purposes of our discussion, that he generally agrees with what

22  I was just saying.  But, to be clear, your point goes one step

23  farther.  And you're saying that not only do they have a

24  feedback system that is programmed to be sensitive to pressure

25  changes, which are a derivative, if you will, of orifice sizes,

1    but you're saying that as an initial matter, their computer is

2    programmed within the meaning of your claim, is programmed with

3    information concerning orifice size, is that right?

4            MR. FERENCE:  Yes.

5            THE COURT:  They say it's not, is that right?

6            MR. FERENCE:  Correct.

7            THE COURT:  What about your equivalents argument?

8            MR. FERENCE:  The range of equivalents is not

9    restricted in this case.  If you look at the file history that

10   was attached to the declaration, the claims went through

11   without any amendment.  So there's no prosecution history -- to

12   restrict the range of equivalents.  And if for some reason

13   there is not a literal infringement, Mr. Hapeman in his

14   declaration said that this device operates in substantially the

15   same ways, performs in substantially the same function.

16           THE COURT:  I guess this only becomes relevant -- if

17   it would come to pass that there was a determination that the

18   defendant did not literally infringe, which in my view in this

19   case would essentially mean that the defendant was right, that

20   its program is based exclusively on pressure and quite

21   independent of any programming based on orifice size.  Your

22   position would nevertheless be that notwithstanding that

23   difference, the product is still substantially the same and

24   operates in substantially the same way, right?

25           MR. FERENCE:  Correct.

1          THE COURT:  But his position is that your problem is

2    that back in 1995, or at least as early as 1995, a variable

3    pressure system, based upon a feedback system that was

4    sensitive to pressure, was already out in the marketplace; how

5    do you get around this prior art problem?

6          MR. FERENCE:  Well, I think Mr. Gelfound is really

7    making a collateral attack on the validity of the patent, which

8    he has to in order to find the patent invalid, he has a very

9    high burden of clear and convincing evidence.  The patent is

10   presumed valid.  As set forth in our papers and in particular

11   in the declaration of Greg Antoun, the Grundfos pump that is

12   out there, that was out there the day they reference, it's an

13   impeller type pump.  Even in the declaration of Mike Kenney, it

14   said it's not capable of maintaining the pressure that the

15   present invention does.  Typically, these machines operate at

16   about a thousand psi or higher.  With the impeller pump, you're

17   lucky if you're going to get 200 psi.  It's a totally different

18   type of pump.  The patent office -- in using the pump, that

19   Grundfos pump in the present system, it would not work.  And

20   that is set forth in the declarations.  Indeed, in the file

21   history, in the notice of allowance, there are some comments

22   directed to the reasons for this statement of allowance.  And

23   in the brief it says "none of the cited patents used separately

24   or together teach for the design of programmable variable

25   volume pressure coolant supply system comprises at least one

1  fluid pressure transducer, an electric AC pump motor, a

2  variable frequency drive, electrically connected to said pump

3  motor and a computer monitoring the coolant pressure via at

4  least one coolant pressure transducer." So we don't feel that

5  this Grundfos piece of art presents a problem with respect to

6  the doctrine of equivalents.

7        THE COURT: All right, anything else you want to

8  tell me?

9        MR. FERENCE: If I may have a moment to review my

10 notes, your Honor?

11       THE COURT: Sure. While you're reviewing, let me

12 ask you. Do I gather that -- do you find anything ambiguous

13 about the face of your claim? Is there any ambiguity such that

14 it would be necessary for me to on -- I didn't see it teed up

15 this way in the papers, an extrinsic evidence hunt, to clarify

16 ambiguous terms or to determine what a special meaning might be

17 to a term? I kind of read this as kind of -- the language of

18 your claim appears to me to be clear and unambiguous, am I

19 wrong on that or did you do a bad job drafting it?

20       MR. FERENCE: I think the claim speaks for itself.

21 It talks about data related to the flow area of the orifice

22 means. I think the claim is reasonably clear.

23       THE COURT: So, do I take it, then, would you -- is

24 it your opinion that the real battle ground here is not in the

25 first instance on claim construction, but on the second issue

1    of whether there's actual infringement?

2           MR. FERENCE:  Yes, as it was teed up in the papers,

3    even adopting the claim construction propounded by Mr.

4    Gelfound, there is infringement as a factual matter.

5           THE COURT:  I'm going to take about a five-minute

6    break, then I'll come back and see if you have anything else

7    you want to say.  Then on the basis of that further

8    enlightenment, I'm going to make a determination as to whether

9    I'm going to give you a ruling from the bench today or whether

10    you are going to subsequently get an opinion down the road.

11           (Recess from 11:15 a.m.; until 11:22 a.m.)

12           THE COURT:  Yes, sir.

13           MR. FERENCE:  Your Honor, may I clarify something?

14           THE COURT:  You sure can.

15           MR. FERENCE:  I want to make it clear to the court

16    that the initial program is based on the orifice size, not on

17    the pressure.  What you're doing is programming --

18           THE COURT:  When you say what you're doing, I take

19    it what you're telling me is what you are doing and what they

20    are doing?

21           MR. FERENCE:  Correct.  You're telling it -- what

22    happens is when you get a small orifice size, the motor speed

23    is going to slow down, it's going to try and maintain the

24    pressure.  It's similar to a situation where somebody is

25    driving down the street in a manual transmission car in third

1    gear and they're going slower and slower and slower.    The car

2    starts bucking.    Eventually, you'll destroy the engine.    The

3    CoolJet and ChipBLASTER systems, what you're doing is

4    programming the orifice size at which you're telling the motor

5    to just give up.    Shut yourself down so that you're not going

6    to destroy yourself.    Similarly, you're doing that with the

7    high end.    When you get a large orifice size, the motor is

8    going to speed up to try to maintain pressure and it reaches

9    the point where it's incapable of maintaining that pressure and

10   the motor will burn up.    So you are programming, initially,

11   into the machines a high range, the higher orifice size and

12   small orifice size at which the machine will work.    And CoolJet

13   puts out on a chart showing what the ranges are.    So those

14   ranges of the orifice size and flow area of the orifice are

15   independent of pressure.    You're not programming pressure in at

16   that point.    And we keep talking about the pressure, the

17   pressure is really an indicia of the orifice size.    When you

18   place your hand over a flame, you're not actually, you may not

19   actually be touching the flame.    But you're feeling the heat

20   that is generated by the flame.    So when you measure

21   temperature or feel the heat, you're getting an indicia of the

22   flame, just like in these systems when you are measuring,

23   you're sensing pressure, you're getting an indicia of the

24   orifice size.

25             THE COURT:    All right.    I appreciate the

1    clarification.  Mr. Gelfound.

2         MR. GELFOUND:  Your Honor, I will be brief with my

3    reply and, of course, if your Honor has any questions.  I was

4    listening to Mr. Ference speak and he mentioned on several

5    occasions that I thought was a little humorous, how the only

6    evidence that we have is the declaration of Mike Kenney with

7    two paragraphs.  But, yet, they've got declarations from all

8    sorts of experts.  Because they have such quantity that that

9    has to raise an issue of fact.  It's not the quantity but the

10   quality.  And Mr. Kenney has submitted evidence that the motor

11   speed is determined by pressure alone and not by the flow area

12   of the orifice.  The declaration, I want to touch on for a

13   moment, I believe that does not raise an issue of fact.  I

14   believe that they don't substantiate that the CoolJet system is

15   in fact programmed with data related to range of the orifice

16   size, but --

17        THE COURT:  In fairness and to be accurate, they

18   don't have to substantiate it, they simply have to raise a

19   triable issue of fact.

20        MR. GELFOUND:  I agree with you, your Honor, I

21   misspoke.  But, I think the most important thing, the thing I

22   would like you to consider is even if everything they say is

23   true, which we believe is not, but let's make that assumption,

24   there is still no issue of fact.  If you read those

25   declarations, they say that they program a range of orifice

size that can be supported by the system.  Again, I'm going to

use my example.  Say one to four millimeters.  But from that

you can't tell what orifice size is actually being used.  And

let me just touch on the language, I just want to read the

actual limitation.  "The computer determines the speed of said

pump based on coolant pressure and the flow area of the

orifice."  Not the range -- but the flow area of the orifice.

If you program one to four millimeters because that is the

range and that tool changes during an operation from one, two,

three and four, the computer doesn't know that.  But the claim

requires that to use that information to compute the speed of

the pump, I'm sorry, to compute the speed of the motor.  For

that reason alone, even assuming that everything the experts

say are true, there is no issue of fact, that claim limitation

is not met based on the record before the court.  Let me just

talk just briefly about doctrine of equivalents.  It is not an

attack on the validity.  It's a fundamental principle that you

cannot expand the scope of your claim under the doctrine of

equilvalents -- covered that which was in the prior art.

Grundfos wasn't a prior art.  Mr. Ference makes the argument

that the impeller pump is different, it can't work in high

pressure systems, so what.

     THE COURT:  The doctrine of equivalents is an

equitable doctrine, correct?

     MR. GELFOUND:  That is correct.

1          THE COURT:  Which is essentially designed to ensnare

2     the unscrupulous who are smart enough to avoid literal

3     infringement but essentially have still knocked the thing off?

4          MR. GELFOUND:  That's correct.  In applying the

5     doctrine of equivalents, you cannot apply things so broadly as

6     to read it as prior art, to ensnare that which was in the

7     public domain.  And the Grundfos system was.  Their attempt to

8     distinguish the two pumps, the impeller pump, which is a pump

9     that CoolJet uses, that is irrelevant as a matter of law.  The

10    claims only recite a pump.  The fact that the impeller pump may

11    or may not work in a high pressure system, again, the claims do

12    not require that it be a high pressure system.  Clearly, the

13    claim is limited under the doctrine of equivalents, such that

14    it cannot encompass the CoolJet system.  Thank you very much,

15    your Honor.

16         THE COURT:  Thank you.  Let's go off the record for

17    a second.

18         (Discussion held off the record.)

19         THE COURT:  All right, I'm going to give you an

20    order.

21                              ORDER

22         Presenting pending before the court is a motion for

23    partial summary judgment filed on behalf of the defendant.

24    Wherein, the defendant seeks a ruling that its high pressure

25    coolant delivery system does not literally infringe on the

45

1    Antoun patent, which I'll refer to hereinafter as the

2    plaintiffs' patent.  And, further, that the defendant is not

3    liable under the doctrine of equivalents.

4         Summary judgment, of course, is appropriate only if

5    the pleadings, depositions, answers to interrogatories,

6    admissions on file, together with any affidavits which may have

7    been filed, show that there is no genuine issue as to any

8    material fact and that the moving party is entitled to summary

9    judgment as a matter of law.  See Federal Rule of Civil

10   Procedure 56(c).

11        Now, a literal infringement analysis essentially

12   requires two steps.  The first being that the asserted claims

13   must be interpreted by the court as a matter of law to

14   determine their meaning and scope.  See Markman v. Westview

15   Instruments, Inc., 52 F.3d 967 (Fed.Cir. 1995).  At the second

16   step, it is incumbent on the trier of fact to determine whether

17   the claims as they have been construed, read or infringe on the

18   accused product.  In order to establish literal infringement,

19   every limitation that is set forth in a claim must be found in

20   an accused product, exactly.  See Becton Dickinson and Company

21   v. C.R. Bard, Inc., 922 F.2d 792 (Fed.Cir. 1990), as a general

22   proposition infringement, whether under a literal analysis or

23   under the doctrine of equivalents, is an issue of fact.

24   Southwall Technologies, Inc. v. Cardinal IG Company, 54 F.3d

25   1570 (Fed.Cir. 1995).

The court in <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, (Fed. Cir. 1996), had an occasion to sketch out in some detail the appropriate analysis in construing a claim. The court observed:

First, we look to the words of the claims themselves both asserted and non-asserted to define the scope of the patented invention. Although, words in a claim are generally given their ordinary and customary meaning, patentee may choose to be his or her own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history. <u>Id</u>. The court in <u>Vitronics</u> then continued:

That it secondly is always necessary to review the specifications to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. And, third, the court may also consider the prosecution history of the patent.

Finally, the court had the occasion to address the significance of an ambiguously stated claim in the manner or method in which the court should approach a claim under those circumstances. The <u>Vitronics</u> court observed:

In most situations, an analysis of the extrinsic evidence alone will resolve any ambiguity in a disputed patent claim term; in such circumstances, it is improper to rely on

1    extrinsic evidence.  In construing the claims, we look to the

2    language of the claims, the specification and the prosecution

3    history.  Extrinsic evidence may also be considered if needed

4    to assist in determining the meaning or scope of technical

5    terms in the claims.

6          In large measure, then, it seems to me that the

7    scope of the inquiry insofar as the claim analysis is concerned

8    is dictated in large measure by the clarity or lack thereof of

9    the claim terms.  Here, independent claims 1, 7 and 14 each

10   recite a programmable, variable volume and pressure coolant

11   system with a motor-driven pump that provides coolant.  The

12   speed of the pump is controlled by a variable frequency drive.

13   The requirements insofar as the computer is concerned that

14   comprise the plaintiffs' claim are set forth as follows:

15         Said computer monitoring the coolant pressure via

16   said at least one fluid pressure transducer, and being

17   programmed with data related to the flow area of the orifice

18   means; and wherein said computer determines a desired speed of

19   said pump motor based on the coolant pressure and the flow area

20   of the orifice means of the tool ...

21         Said computer controlling the variable frequency

22   drive ... at a frequency that results in said pump motor

23   running at a desired speed.

24         The defendant contends that, in its words, that the

25   claim language is "clear and unambiguous."  Specifically, as

1    set forth more fully at page nine of the brief, it summarizes

2    the claim language as follows:

3        "It, meaning the claim language, "requires a

4    programmed with data relating to the flow area of the orifice.

5    The computer monitors the coolant pressure, and determines the

6    speed of the pump based on both (1) the coolant pressure and

7    (2) the flow area of the orifice.  The computer controls the

8    variable frequency drive to force the pump motor to run at the

9    desired speed."  That's page nine of the defendant's brief

10   in support of its motion for summary judgment.

11       Consistent with the previously-described standards,

12   I see nothing ambiguous in the claims as stated, nor the need

13   for consideration of any extrinsic evidence to construe them.

14   Further, I do not see that any special terms or meaning has

15   been attached to any of the words in the claim, nor do I

16   consider the prosecution history here is relevant in any form

17   or fashion.

18       Having tried to peel this apple to its core, it

19   seems to me that the critical issue in this case is whether or

20   not as a matter of fact the defendant's product controls the

21   speed of the pump based on both, emphasis on both, pressure and

22   the flow area of the orifice.  Or as otherwise stated, whether

23   or not as a matter of fact in order for the defendant's system

24   to function as it is designed, it is necessary that its

25   computer be programmed with data related to the flow area of

1    the orifice.  The defendant, through its experts, contends that

2    its system, in adjusting the rate of flow, relies exclusively

3    on the pressure and that unlike the plaintiffs' system, it does

4    not program data into its computer relative to the flow area of

5    the orifice.

6        As discussed more fully at oral argument and as

7    previously reviewed by the court in preparation for the summary

8    judgment argument, the plaintiff has produced several

9    affidavits, and I should say parenthetically, the defendant has

10   as well for the opposite proposition.  But the plaintiff has

11   produced affidavits in support of the proposition that contrary

12   to the defendant's contention, it does in fact program

13   information relative to the orifice size or flow.  In part,

14   Mr. Adelman's declaration, Mr. Adelman being an engineering

15   manager with ChipBLASTER, opines, for instance:

16       "The range of orifice sizes in which pressure is

17   maintained must be chosen by CoolJet, or any coolant delivery

18   system manufacturer, based on pump motor's high speed cutoff

19   related to the largest orifice flow area in the range, and low

20   speed cutoff related to the smallest orifice flow area in the

21   range."

22       Paragraph 10.  "That data relating to the flow area

23   of the orifice must be programmed into the computer that

24   controls the variable speed drive in order for the coolant

25   delivery unit to function properly, and as desired by its

1    manufacturer."

2              Paragraph 14.   "After the initial programming

3    related to the flow area of the orifice, as the flow area of

4    the orifice changes with the change of the tool being used to

5    cut or drill metal, the CoolJet system receives a signal from

6    the transducer that is directly related to the flow area of the

7    orifice, and varies the drive frequency, to cause the motor to

8    spin faster or slower, and the pump to increase or decrease

9    output, as described in the 216 patent."

10              In my view, then, as I said before, the critical

11   issue insofar as the question of literal infringement is

12   concerned is the issue as to whether the defendant in fact

13   programs information relative to the orifice.

14              For the reasons previously set forth on the record,

15   it is my view, consistent with the summary judgment standard I

16   have previously indicated, that summary judgment is

17   inappropriate because there remains, based in part on the

18   declarations I previously described, a material issue of fact

19   on that point such that its resolution by a fact finder, rather

20   than by the court, would be appropriate.   Let's go off the

21   record.

22              (Discussion held off the record.)

23              (Whereupon, at 11:50 a.m., the proceedings were

24   concluded.)

25                              -  -  -

51

1                        C E R T I F I C A T E

2

3

4        I, Ronald J. Bench, certify that the foregoing is a

5    correct transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10

11    _____

12    Ronald J. Bench

13

14

15

16

17

18

19

20

21

22

23

24

25